Thank you, Judges of the Ninth Circuit, Madam Clerk, Opposing Counsel. May it please the Court, my name is Blair Christensen, and I represent the appellant on this appeal, Anchorage Chrysler Center. On appeal, Anchorage Chrysler Center asks that this Court reverse the lower court ruling and hold that Great-West is obligated to provide the insurance coverage that Anchorage Chrysler Center reasonably expected under the stop-loss contract or in the alternative that the lower court erred in failing to find Great-West liable under risk-equitable provisions. Anchorage Chrysler Center also requests that this Court find that the lower court erred in granting Great-West's motion for summary judgment on the issues of waiver, estoppel, and the covenant of good faith and fair dealing. In the underlying action, the District Court held that Anchorage Chrysler Center failed to provide sufficient COBRA notice because it did not tell Mr. Clapper that he had 60 days within which to elect COBRA coverage. Anchorage Chrysler Center brought this third-party action against Great-West in order to enforce the stop-loss contract. Under Alaska law, an insured is entitled to the coverage that they reasonably expected under an insurance contract. The District Court's ruling was far too broad to provide Anchorage Chrysler Center with this coverage. Typically, an indemnity provision is supposed to insure against risks that were not contemplated under an insurance contract or under any contract. Anchorage Chrysler submits that this is exactly the type of risk that it bargained for with Great-West. Mr. Clapper was a beneficiary under the plan. He was entitled to elect COBRA notice as if he had done it in a timely fashion in the District Court, and that typically under an indemnity provision, what would have been excluded is a risk that was not contemplated, a risk by the court. Excuse me. As to the meaning of the indemnity provision, particularly in light of the reasonable expectations of the insured, that issue was tried before Judge Holland, right? And under the breach of contract theory. Under the breach of contract theory? Yes. It was, and he found that any act meant just that, any act. Although Alaska law requires that an insured is entitled to coverage reasonably expected, even if that conflicts with the actual written contract. Yes. My question was that that issue was tried at a bench trial, right? I understand your legal argument on that. Did you provide any evidence to the, any specific evidence as to the reasonable expectations of the insured in this particular context? I believe Jean Edwards, the plan administrator, believed that she was contracting for stop-loss coverage under the plan if a beneficiary was entitled to benefits under the plan. And she testified that she believed that that was exactly the situation. Yes. No, I understand that. I was actually referring to the indemnity provision. I don't. I can look. At this moment, I can't point you to specific evidence. And the rest of the claims resolved on summary judgment, right? Yes. It's hard to see from your pleadings how an ERISA theory was presented to the district court. Will you explain that? Anchorage Chrysler Center consistently asked this court to, or asked the district court to determine the obligations under the stop-loss contract and under ERISA. Where did you say that in your complaint? I read your complaint. And it refers to an ERISA plan, to be sure. And it talks about determining the obligations under the plan. But I don't see any theory in there that asserts breach of fiduciary duty under ERISA. Is that true? That's true. And we're not arguing for breach of a fiduciary duty. All right. What ERISA remedies do you think you presented to the district court? In? I mean, pure ERISA theories, not pure. The ERISA in, as I'm sure this Court knows, in Gibson v. Prudential Insurance Company of America, this Court held that ERISA relief is not limited to relief against the plan or its fiduciaries, but can be obtained against an insurance company that's a non-fiduciary, that handles a claim. And that's exactly this situation. I wasn't asking what you could have done. I'm asking what you did. But I believe that I don't see. In fairness to Judge Holland, if you're up here complaining about that you're saying that he should have, that he erred as a matter of law plainly because he didn't, did not rule in your favor on an ERISA remedy, then certainly he should have had the opportunity to be presented with that. And I may be wrong, but I don't see anything in the record where you asserted that you had a fair theory purely under ERISA. The second part is if you had, there would have been a fair the defense would have had a fair theory to argue that it was that your State law theories were preempted. In my view, you probably have a choice. One, I mean, essentially you had a choice of theories. You had to say, well, we're going to have, we're going to proceed under ERISA theories and say this is an ERISA-governed relationship, or we're going to proceed under State law theories. And it looks to me as though you elected State law theories, and I think perhaps correctly. But my question is to your ERISA theories on appeals. How do we, how do we reach those? Yeah. And I believe that Anchorage Chrysler Center did ask this, ask the lower court to determine the rights under ERISA. In Court Record 240 at 13, Anchorage Chrysler Center argued that the stop loss, that allowing Great West to escape its obligations under the stop loss contract would be contrary to both the language and policy of ERISA. That clearly seemed to, the argument went on from there, that that argument clearly seemed to raise ERISA issues. And as to your question as to whether you're entitled to ERISA remedies or contract remedies, and you can't be, you can't have both. You have to pick one or the other, really, in a sense. You have to, I mean, in terms of your theory, either it's ERISA, ERISA is going to preempt your State law remedies or you've got to rely on your State law remedies. It may be a distinction without a difference in your case because you're arguing from the plan anyway. Or you're talking from the contract or the insurance contract. But it just, I just don't see anywhere by mentioning policy, by mentioning ERISA, that you, in fact, are seeking or made it clear to the district court and to your opponents that you were seeking, in fact, specific ERISA remedies. If we had, I suspect we would have seen findings and conclusions on that. I believe that opposing counsel raises that issue. Anchorage Crisis Center believes that it raised that issue below and is unsure how else it could have briefed the issues in order to ensure that the district court took notice. That is. I understand, Your Honor. I want you to proceed. Your time is running, so I don't want to detain you from your other arguments. Back to the reasonable expectations of the parties. Anchorage Crisis Center submits that the risk under the indemnity provision that Great West was trying to shift was the risk of statutory penalties, fines, fraud, things that parties typically do not contemplate as covered under an insurance contract. That is not the situation. The district court's ruling allows Mr. Clapper to elect benefits just as if he had elected benefits under the plan in a timely manner. Further, courts that have addressed the issue have found that a good faith effort is all that's necessary to comply with COBRA's notice requirements. In fact, there was no guidance on the issue as to what notice was required until May of this year when the regulations were finalized. That's nearly 11 years after Gene Edwards, the plan administrator, provided notice to Mr. Clapper. Gene Edwards testified that she believed that medical benefits were very important. She provided the cost of the benefits to Mr. Clapper, how long he would get coverage, how long his dependents would get coverage. And she testified that she knew the importance of that notice. She was at a disadvantage because the original manual that Great West provided directed her to the election notice instead of the notification form, which were two different forms, and it was a title in Great West's manual. She proceeded under that theory. They later corrected it. But she did in good faith try to comply with COBRA requirements, and that's what other courts have found is sufficient. Anchorage Crisis Center submits that this policy, that the policy behind ERISA would allow the stop-loss coverage to be in effect against Great West in this situation because it is supposed to be a uniform federal law that allows employers to provide benefits to employees and that they do so knowing that one law controls, one law is going to be what's at issue. And in this situation, Anchorage Crisis Center contracted for the risk that it would have stop-loss coverage for any catastrophic injury over $35,000. But then it turned out that after going all the way through the trial, Great West refused to provide this coverage. In this situation, small employers like Anchorage Crisis Center that has 120 employees would have a harder and harder time providing health benefits because you cannot contract against the exact risk. You'll never know if the indemnity provision is going to kick in. You cannot contract against the risk of having catastrophic loss of the plan. Counsel, are you suggesting that because Great West participated in the trial that the doctrine of equitable stop-loss applies? No. That is not our exact argument, Your Honor, with all due respect. Our argument is that because Great West was informed of all the facts that it had that it needed to determine if the indemnity clause was going to be triggered before the judgment in the district court was entered, that Anchorage Crisis Center was prejudiced by failing to know this ahead of time. It wasn't just that it participated. It made affirmative assurances with all facts known to it. No facts changed from the time it made assurances to Anchorage Crisis Center to the time the judgment was entered. And that is what prejudiced Anchorage Crisis Center. What actions did you take in reliance upon those assurances that you claimed prejudiced you? There were several settlement discussions. Anchorage Crisis Center opted not to settle because it believed that it had insurance for catastrophic loss. And so had it known that it was going to be its liability was far more than what it had anticipated, it would have tried to settle prior to a judgment against it. Anchorage Crisis Center expressed concerns that if it were to lose in the lower court, that it would have this judgment against it, and it asked for affirmative assurances, which it got in a telephone conference on August 29th of 1995. It tried to protect itself by putting those concerns and everything discussed in the letter that it sent to Great West. On September 6th, Great West responded that that letter accurately summarized the discussion, and Anchorage Crisis Center promised to move on and litigate the claim to the best of its ability. Then it allowed Anchorage or it allowed Great West to read its pleadings before they were filed. It discussed litigation tactics with it, discussed the strengths and weaknesses of its case with Great West, and then proceeded through trial because it did not, it believed it had the backing of an insurance company and therefore did not settle. And after the judgment was already rendered and Anchorage Crisis Center was at a much different point, it was already liable to Mr. Klapper, to Kappa, the guardian. It was too late. And that's when Great West said, we believe that the indemnity provision applies here. Anchorage Crisis admits that that is, there's a genuine issue of material fact as to whether that is a stop hold or an alternative whether that is waiver, and that there's genuine issues of material fact as to whether Great West really had at least one reasonable basis with which to deny the stop loss coverage, allowing the court should have looked at that and determined a good faith and fair dealing claim. If this court reverses the lower court's ruling, it should also reverse the attorney fees below. So in sum, Anchorage Crisis Center submits that the lower court erred in failing to find that Great West is obligated to provide the stop loss coverage that a layperson would reasonably expect. In these circumstances, a layperson would reasonably expect that the risks that were contemplated by the indemnity provision were things like statutory fees, fraud, things not contemplated under a stop loss coverage. The lower court's ruling had the effect of allowing Mr. Klapper to have benefits just as if he had elected them in a timely manner and he was a planned beneficiary. That is clearly not something contemplated by the indemnity provision. In the alternative, Anchorage Crisis Center asks that this court find that the lower court erred in finding that Great West's equitable provisions do not govern, and that there's genuine issues of material fact as to the claims of waiver, a stop hold, and fair dealing. Thank you. Good morning. May it please the court, counsel. My name is David Carter. I'm here on behalf of the Appellate Great West. Judge Holland's rulings were correct. I think it's very important for the panel to understand that the findings of fact entered by Judge Holland following a bench trial have not been challenged in the briefing by Anchorage Crisis. Speak up a little bit. Yes. I wanted to say that I think it's important that the findings of fact that were entered after a bench trial have not been challenged by Anchorage Crisis. And key among those findings are that they recognize that they have the duty to provide COBRA notice to their employees. And we briefed in our, you know, the fact that a plan sponsor, such as ACC, is the logical choice. It's the way it normally works, because they know when their employees are leaving their employee. And so they are charged, naturally, with providing notice. It's also important to understand this is a self-insured plan. ACC, and we got into that in the briefing in trying to describe how some of that works, basically pays the health costs of its employees until and unless they get to an aggregate point in a year after which Great West will pay above that. And certainly in the individual case, there is a stop-loss provision which applies. So when your company is notified that the stop-loss might kick in in this case, did you send a reservation of rights letter to the company saying, we don't think that we're going to pay that stop-loss provision? There was a letter sent in October of 1996 from Great West to Anchorage Chrysler pointing that out. So the reservation of rights letter is sent, and then the case goes on, and tell me what happens in settlement negotiations? Did Great West participate? Did you direct an event? We participated to the extent we, as a kind of a business relationship gesture, offered to contribute up to, I think it was $20,000, and that's in the record, Your Honor. It was clearly not an offer which one could interpret as, certainly ACC could not interpret as stating that Great West believed it had an application of a stop-loss provision. Well, why would you do it? Again, they had an existing business relationship. And, of course, in hindsight, these things generate. This was back in 1996. We're in 2004, Your Honor. There's been a lot of money spent, you know, in just defending this issue. So there are other reasons why there was a, you know, that amount was offered. Sure, but I think as you clear the smoke away from the case and find out what ACC is really angry about, it seems to me they're angry about the fact that they had the wrong impression at the time of settlement that you, in fact, were going to contribute, and they made some litigation choices based on that. And normally, in that circumstance, one of two things happens. The insurance company says, look, we have a dispute with you, and we're going to, let's pay off the plaintiff if the plaintiff, in fact, has a good claim, and we're going to resolve our indemnity claims later. Or at least there was some clear understanding of what the positions of the parties are. So explain to me what, in your view, happened here that left both of you with such a different view of what was going to follow after the litigation's conclusion. It's important to understand that this is different than the auto or homeowner's policy. I agree. That's right. And there's really, we refer to it as a primary versus excess insurer type scenario where the primary insurer has certain duties. And, of course, what happened is initially ACC felt that it had given proper notice. It subsequently was determined they hadn't provided proper COBRA notice, which was indisputably their responsibility in the contractual relationship here. So they failed in that regard. They didn't meet that. This is not a situation where Ray West, where ACC paid a premium for... No, I understand the relationship. I'm just sort of asking, how, in your view, did everything fall apart with this miscommunication? Because obviously, or at least they allege, and you allege differently, that during the Great North, Great West, sorry, was going to, there's a Great Northwest company, that's right. Great West was going to do subsequently. So I'm just asking for your explanation on this record. Well, certainly below, Your Honor, they argue that they reasonably relied on a letter that was sent by me on behalf of Great West. And that letter was reviewed very carefully by Judge Holland in connection with the waiver and compromise, which was addressed. And he found that, I mean, it said what it said, and that no one could reasonably rely on that letter as suggesting that Great West was agreeing that it had stop-loss obligations. All it said is, we agree that you, you know, your letter accurately states the conversation. And it went on from there. And then it wasn't long thereafter that Great West was advising ACC of the indemnity language. And, Your Honor, I understand when this issue was presented to Judge Holland in the summary judgment briefing, there was no response in the ACC's briefing on the indemnity question. I did want to touch briefly on, Your Honor, to ask counsel for ACC if this was an ERISA or a state law claim. And I think it's pretty clear it was a state law claim issue. They elected that route. Their third-party complaint at CR 180 has claims for waiver of estoppel, good faith, and breach of contract. And the bench trial not only addressed the indemnity issue, but also addressed the breach of contract issue. Yes. Excuse me, counsel. On that issue, let's assume they didn't waive their ERISA claim. Would you be an ERISA fiduciary? No. I don't believe that we are. And even if we were, I think we'd still be entitled to judgment under — I just — I don't think that we are in these circumstances. Well, let's assume that you are. Well, let's assume that they didn't waive the claim without making any statement about that. And assume that they have a fiduciary — I mean, ERISA claim. What is your response, that you are not an ERISA fiduciary? I think what we're dealing with is a commercial contract between an employer and a company that provides administrative — and then has these subsidiary aggregate and stop-loss issues. So there's that component of insurance in the deal. But it's mainly an administrative claims processing function. And under WICCI-IV, which is a case that we referred to in our brief, a very similar situation. An auto dealer, just ACC is also an auto dealer, Anchorage Chrysler, and the Ninth Circuit in that case had no ERISA claim. Now, I think there was an issue about, did they raise it below there? And — but I don't see how the fiduciary — if, assuming — assuming are you an individual fiduciary, I don't see how that changes the analysis. So it doesn't make any difference whether you — Our contractual relationship. Because our relationship — I mean, the ultimate — the beneficiary under ERISA, of course, is the injured employee or his dependent. And that individual has been compensated. Right. Well, in your Schedule of Administrative Services, it says, Great West is to provide benefit determination in accordance with the plan. What did that mean? Can you read that section again? It's the Schedule of Administrative Services, which is in your contract. And in the Schedule of Administrative Services, it says, Great West is going to provide benefit determination in accordance with the plan. Right. That's part of the claims processing function, Your Honor. Right. You know, health bills are — health bills are sent to Great West, and it determines whether it's covered under the terms of the plan. Ultimate determination rests with Anchorage Chrysler. Great West has the power to deny claims? I'm sorry? Great West has the power to deny claims under this arrangement? I think it does have a front-line authority to deny claims, but ultimately the plan sponsor can override that decision. It's very important, too, here that this is a situation where the employer, basically the plan administrator, who was indisputably charged with this notice responsibility, created a liability that would not have existed. There's no dispute about that fact. The actual — there was a contact between the employee, separating employee in early July of 1993. He didn't elect coverage. If he'd been given his proper notice that he had 60 days in which to make that election, that time frame would have passed. His son was injured in October, you know, 90 days after his employment. So this is a situation where ACC's conduct created a plan obligation, which would not have existed had they complied with their obligation to provide proper notice, and that was central to the lower court's findings on the indemnity provision. The — and, again, it's important to recall, it's not an individual versus an insurance company situation. You heard that Anchorage Chrysler has 120 employees, so it's a larger entity. There was a comment about there was no guidance on COBRA notice, and that really is inaccurate because the court will look at Judge Holland's findings of fact, which is CR 278. He noted therein that Great West had, in fact, provided forms to ACC, which, if used, would have avoided the liability and certainly provided guidance. So it's unfair for ACC to contend that they had no guidance about COBRA notice. The reasonable expectations argument, of course, is that it's an objective standard. It's not a subjective standard. It's not what ACC or their plan administrator thought she was buying, had to look at the contract. And also, it should be noted that she acknowledged that she could not say that she read the materials, and that's important, too, and that's also referenced in Judge Holland's findings of fact in CR 278, and that's not contested here on appeal. I think it's a minimum for ACC to come here and ask this Court to overturn the trial court. It should come with clean hands. It should at least have read the basic information, which would have avoided this entire situation. It appears from your letter that you requested ACC to give Great West certain assurances. Is that right? Mr. Hess writes to you and says, Great West requested that ACC give Great West certain assurances. In response to Great West's request, ACC intends to defend zealously the suit to its conclusion. Did you request that ACC defend the suit to its conclusion? I think we pointed out to them, Your Honor, that it was their responsibility under ERISA law to defend the suit. Well, they were defending it because they were sued, of course. There's a big difference between control of a defense and an employer defending itself. We had absolutely no control over ACC's handling of their defense of CAPA's claims against ACC. Well, how do you explain the paragraph which you said accurately characterized your conversation? It says, In response to Great West's request, ACC intends to defend zealously the suit to its conclusion. And where are you reading from, Your Honor? I'm reading from the letter from Mr. Hess, page 1, paragraph 3, August 29, 1995, to which you responded. This will confirm I've discussed your recent letter of August 29, conference call with my client. We agree that your correspondence accurately summarizes the points raised in the conference call. I'm sorry. I don't have a letter in front of me, but your point would be what, Your Honor? The point is that maybe you directed this defense. Did you tell them to defend the suit? Did we tell them to defend the suit? We did. I'm sure we advised ACC that they needed to defend the suit because this is not a defense contract relationship between ACC and Great West. It is their responsibility to defend. I understand the relationship. But there is a difference if you're providing stop-loss or excess coverage and you then say, all right, we are putting you on notice, primary carrier or self-insured carrier, that we expect you to zealously defend the suit to its conclusion. And if you don't, I gather, we may not provide some of the coverage. There's a big difference between that and saying, thanks for letting us know what the progress of the suit is. We'll see you when it's over. I just don't think that was the nature of the communications at all between, in terms of how they viewed their obligations. We weren't, Great West was not controlling ACC's. Well, let me ask you this question then. Here's what the sentence says. In response to Great West's request, what was the request? I don't know. It would have to be that they defend the suit vigorously, zealously. It says, in response to the request, ACC intends to defend zealously the suit to its conclusion. So the request would have to be, it would seem, that ACC defend the suit zealously to its conclusion. And there would be nothing unusual or inappropriate about such a request. Except if you're saying, don't pay, don't settle, they want you to defend it to its end. That's what they're saying today. That's what the claim is today, is that they took a different course of action based on your conversation with them. And you're telling me you don't remember what you meant by that or what it possibly means. Because it says here, pretty much black and white as far as I can tell, in response to the request, ACC intends to defend the suit zealously to its conclusion. And previously you've been talking about settlement. So I guess I don't understand what you're saying happened in that conversation that you've heard. And that's what I've been trying to get at with my questions. What did you tell them to do? Well, I'm looking at this letter, too, Your Honor, and it's, you know, they're saying Mr. Hess, who's an in-house counsel for Great West, a plan is required to provide benefits that would provide stop-loss coverage as set forth in the contract. Right? And there's no waiver in any of this about any of the contracts. No, I understand. I'm just trying to figure out. That's not my question. I'm not asking about the legal theory. I'm asking about what was the conversation. Because they claim that this sentence gives rise to perhaps an estoppel theory, and I'm just trying to figure out what your alternate theory and meaning of that sentence is. I'm not trying to trick you. Yeah, well, we're talking about something that occurred nine years ago, Your Honor, and it's not clear to me what assurances or what requests Great West would have made. I think what had happened is we'd had a conversation, and they had asked us. I think we were at the point where we had gotten out of litigation. We were sued directly, and we'd gotten out of litigation. And there was discussion between the parties about who, about what role Great West would be playing. And we said, you know, we have a contract with you, we'll honor the contract. But it was their obligation to defend the ERISA claims being pursued against them by CAPA. And I think that's all that this was, Your Honor. And they, through their own separate counsel, continued to defend this case. They never said, gee, we really need to get this thing settled. They certainly, after 1996, when we told them about the indemnity claim and our position was very clear, they never settled the case then either. When was the first time you let them know about your position on the indemnity claims in 1996? In writing, I think it was. I don't know if there was anything orally. But in writing, I can tell you it was in 1996. Certainly, they had the indemnity language in their contract, Your Honor. Well, sure. I should be summing up. I see I have a minute left. I think that the central points to, and on this last issue, though, I don't believe the record reveals that that was an issue that came up before Judge Holland, that they somehow litigated this thing all the way simply because of this letter. So I want to. No, but that's what they said today. So I asked you for your response. Right. And I'm somewhat caught off guard because it's not something that was an issue down below. It's a self-funded plan. ACC is the primary insurer. This arrangement allows an employer to have some cost savings, but they have some duties. The indemnity provision, of course, is the only way that Great West can protect itself from inappropriate COBRA notice issues. And it's got that salutary effect by forcing employers to provide proper notice. That task is theirs, and they didn't comply with it. And that's why we have a lawsuit in this case. So I would ask the Court, with all due respect and respectfully submit, that the lower court ruling was the correct ruling. It was a lot of briefing, a lot of information, and I would ask the Court to affirm. Thank you very much. Thank you again, Your Honors. I just want to bring up a couple brief points. As this Court noticed during opposing counsel's arguments, Anchorage Crisis Center did believe that Great West was asking for assurances that it would provide stop-loss coverage if it was determined that Mr. Clapper was entitled to benefits. The Court did decide that Mr. Clapper was entitled to benefits under the plan. That was always Anchorage Chrysler's position. If you look at the motions for summary judgment, clerk's record 240, page 22 on, that was always Anchorage Chrysler's arguments. Anchorage Chrysler believed that it only had $35,000 worth of exposure in this case because of the stop-loss coverage. But because Great West sought assurances that Anchorage Chrysler Center would fight hard in the litigation and not subject Great West to a large claim above $35,000, Anchorage Chrysler Center litigated the claim and tried to lessen Great West's exposure. And Great West sought assurances for that promise. Anchorage Chrysler Center did provide notice, just to make that clear. It provided the election form that it was directed to in the first manual by Great West. That was a typo. And then Jean Edwards testified that she couldn't recollect when she read the second manual, which are two completely different manuals. The first manual had a typo, and she read that manual, and it directed her to the election form for both notice and election. And then she testified that she couldn't recollect that she read the second manual, which corrected the typo. Anchorage Chrysler Center did argue below that Great West was a fiduciary  because it had discretion in accepting or denying benefits. And so that is something that was raised below. When Anchorage Chrysler Center stated that there was no guidance in opening argument, I was referring to there was no regulations at the time. There was no regulations as to what COBRA required. Anchorage Chrysler Center, Jean Edwards did read the first manual that counsel for Great West pointed to, but there were no legal regulations as to what Anchorage Chrysler Center had to inform. And the only deficiency of the notice that Mr. Clapper received was that he was not told that he had 60 days within which to elect. He got all the other information he needed, and certainly both he and Ms. Edwards testified that what was important to him was the cost of the insurance coverage. That's all he cared about. And he got that information. With no further questions? Thank you, counsel. The case just argued will be submitted. The court will stand in recess for the day. All rise. The court will dismiss and adjourn. Thank you. Thank you. We have water? Yeah. Yeah. Yeah. All right. Okay. All right. Okay. All right. Okay. Okay. Okay. Okay. Okay. All right. Okay. Okay. Okay. Okay.
judges: D Nelson, Reinhardt, Thomas